IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 17-00125-01-CR-W-GAF |
| JONATHAN SANCHEZ-MUNOZ, | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant's Motion to Suppress Evidence (doc #29). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On April 18, 2017, the Grand Jury returned a three-count indictment against defendant Jonathan Sanchez-Munoz. Count One of the indictment charges that defendant, then being an alien illegally and unlawfully in the United States, knowingly and unlawfully possessed, in and affecting commerce, a firearm. Count Two charges that defendant knowingly possessed a document prescribed by statute and regulation as evidence of authorized stay or employment in the United States, that is a Permanent Resident Card, which the defendant knew to be forged, counterfeited and falsely made. Count Three charges that defendant, an alien who had been previously deported and removed from the United States on or about April 28, 2015, was found in the United States without having obtained the express consent of the Secretary of Homeland Security or the Attorney General of the United States for readmission into the United States.

On January 30, 2018, the undersigned conducted an evidentiary hearing on the motion to suppress. Defendant Sanchez-Munoz was represented by Assistant Federal Public Defender

Stephen C. Moss. The Government was represented by Special Assistant United States Attorney Kimberlee L. Moore. The Government called Detective Steven Cook, Detective Jeffrey Pagel, and Officer Harold Echols of the Independence, Missouri Police Department as witnesses. The defense called no witnesses to testify.

## II. FACTS

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Detectives Steve Cook and Jeffrey Pagel were working as off-duty officers at the Independence Center mall on March 4, 2017. (Tr. at 3-4, 28-29) As Detective Cook was beginning his shift at approximately 5:00 p.m., he heard a mall security officer announce over the radio that there were some males and females pushing a baby carriage and that at least one of the males was wearing something described as MS-13 clothing. (Tr. at 5) Detective Cook walked around the mall trying to locate the people. (Tr. at 5) He was joined by Detective Jeffrey Pagel when he reported for his off-duty shift. (Tr. at 5, 29)

2. Simons Company, the property owner of Independence Center mall at the time, had a Code of Conduct policy. (Tr. at 4-6, 30) One of the things listed in the Code of Conduct is that guests wear appropriate clothing. (Tr. at 6; Government's Ex. 6) Inappropriate clothing includes gang-related clothing. (Tr. at 6, 30) If a guest is violating the Code of Conduct, they will be asked to leave the property. (Tr. at 6)

3. Detective Cook testified that he and Detective Pagel were on the upper level of the mall when they saw at a distance the individuals they believed mall security had earlier reported. (Tr. at 7) One individual was wearing a long-sleeve, dark-colored denim-type shirt which had on the back a very large number 13 with Old English script lettering above the number. (Tr. at 7) Detective Cook testified that from where he was standing he could not read the lettering. (Tr. at 7) Detectives Cook and Pagel approached the individuals, three males. (Tr. at 7-8) Detective Cook testified that it was not the complete group because mall security had reported that there were also females and at least one child. (Tr. at 8)

4. Detective Cook testified that he does training all over the United States pertaining to gangs. (Tr. at 9) Detective Cook testified that he is familiar with the number 13 as being affiliated with Sureno street gang members. When he was close enough the read the lettering above the number, Traviesos, he recognized that as a gang set of Sureno street gangs. (Tr. at 9) Detective Cook testified that the three males also had blue bandanas hanging out of their pockets. (Tr. at 8) Detective Cook testified that the three males had the appearance of being involved in gang

activity. (Tr. at 8)

5. The detectives explained to the three males the policy of the mall and told them that they were in violation of the mall's Code of Conduct with their clothing and that they would have to leave.[1] (Tr. at 8, 13) The three males were very cooperative and said they understood and had no problem leaving the property. (Tr. at 8, 13, 31) Detective Cook told them that he and Detective Pagel would escort them out. (Tr. at 8) The detectives walked the three males to the main entrance of the mall, the 39th Street exit, and told them to leave the property. (Tr. at 8, 12) Detective Pagel testified that he explained that the property included the surrounding parking lots. (Tr. at 32) Detective Pagel also explained that mall security is very aggressive in making sure that people do not re-enter the mall and if they came back in that day, they would be arrested for trespassing. (Tr. at 32, 45-46) Detective Pagel testified that, based on his personal experience working off-duty at the Independence Center mall, it is very common for people to be cited for trespassing if they do not comply with a request to leave the mall. (Tr. at 32) The three males did not mention that they were at the mall with anyone else. (Tr. at 13, 38) Detective Pagel testified that when persons who are asked to leave the mall advise that they are at the mall with family members or friends, the officers will take them to the mall substation,[2] have them contact their family or friends to meet them there, and then they all leave the property together. (Tr. at 39)

5. Detectives Cook and Pagel stood outside and watched to make sure the three males were going to do what they were asked to do, that is leave the property. (Tr. at 13, 32) The officers watched the three males get into a vehicle and start to head out on the outer road, but then noticed that they were passing exits to 39th Street. (Tr. at 13, 33) Detective Cook testified that he thought, why aren't they leaving, they were told to leave. (Tr. at 13) At that point, Detective Pagel contacted Officer Harold Echols, who worked out of the substation, and told him that these people were told to leave the mall and they are currently driving around to the back of the mall. (Tr. at 13, 33) Detective Cook testified that a lot of times when officers put

---

[1] Officer Harold Echols's Field Report states:

> Mall officers contacted the group and explained their policy about gang attire. They were given an option to change their clothing or leave the property. [T]he subjects declined to change so mall officers asked the subjects to leave.

(Government's Ex. 9 at 4) Officer Echols testified that it was his understanding that mall security had given the subjects that option. (Tr. at 60) Detective Cook testified that he does not recall giving the three males the option of removing the clothing or having to leave the mall. (Tr. at 20-21) Detective Pagel testified that he does not recall giving them the option to change their clothing. (Tr. at 31)

[2] The Independence Police Department has a substation at the Independence Center mall. (Tr. at 15)

3

people out of the mall, they will get in a vehicle and then they will try to slip back in another entrance. (Tr. at 14) The officers were concerned that the three males were going to park somewhere else and sneak back in the mall. (Tr. at 14)

6. Officer Echols testified that he responded to the area to ensure that the subjects who were requested to leave did, in fact, leave the property due to the fact that they were possible gang members. (Tr. at 47) Detective Cook testified that Officer Echols picked up the subject vehicle as it passed another exit to get out and started to circle around to the back side of the Sears store, clearly not leaving the property. (Tr. at 13-14) Officer Echols activated the emergency lights on his patrol car and stopped the subject vehicle down in the lower lot of Sears. (Tr. at 14, 48, 51) Officer Echols testified that he stopped the subject vehicle because "at that point I believed that they were trespassing, or they at least didn't understand that they were trespassing. And I decided to re-contact them." (Tr. at 48) The trespassing ordinance that Officer Echols had in mind when he conducted the stop, Section 12.05.008 of the City Code, Independence, Missouri, provides:

> A person commits the offense of trespassing if, without lawful authority, that person knowingly:
>
> * * *
>
> B. Refuses to leave the real property of another upon demand of the owner, occupant or person lawfully in charge thereof.

(Tr. at 49; Government's Ex. 5)

7. Officer Echols testified that he exited his patrol car and proceeded up to the driver's side of the subject vehicle to contact the occupants and to ask them why then had not left the property. (Tr. at 51) As Officer Echols was walking to the vehicle, a woman with some children spoke to him and said that the vehicle was picking them up. (Tr. at 64; Government's Ex. 1 at 17:53:16) Officer Echols asked the driver of the vehicle if he had told anyone that he had somebody to pick up and the driver responded no. (Government's Ex. 1 at 17:53:30) Officer Echols testified that he explained to the driver why he was stopping him and that he was unaware that they had to pick anybody up. (Tr. at 52) Officer Echols testified that he had not heard any radio communication stating that the three males had been observed with women and children. (Tr. at 68-69) Officer Echols testified that he believes that someone can still be trespassing if they have been told to leave the mall and then do not leave, but come back to pick up family or friends. (Tr. at 66) Detectives Cook and Pagel responded to assist Officer Echols. (Tr. at 14, 34) Detective Cook testified that while the contact was being made, females and juveniles started coming to the subject vehicle from one of the exits at Sears. (Tr. at 14)

8. Officer Echols attempted to identify the occupants of the vehicle. (Tr. at 52-53)

4

Based on the fact that they were potential gang members and because they had not left the property as directed, mall security had requested that Officer Echols put the three males on the barment list. (Tr. at 52, 71) Officer Echols explained that the mall has a list of individuals who have been advised of trespassing and who the mall does not want on the property. (Tr. at 52) The barment is a list of those individuals. (Tr. at 52) Officer Echols testified that as a police officer, he is able to put individuals on the barment list and that he does it all the time. (Tr. at 52, 67)

9. Officer Echols asked the persons in the vehicle for identification. (Tr. at 53; Government's Ex. 1 at 17:53:32-50) No one would produce any identification. (Tr. at 53-55; Government's Ex. 1 at 17:53:51-59) Officer Echols then asked for the driver's name and date of birth so that he could verify who he was and that he had a driver's license. (Tr. at 53) The driver said his name was Reno Valdez. (Tr. at 53) Officer Echols ran this name through dispatch. (Tr. at 53) It came back that Reno Valdez was not a licensed driver. (Tr. at 54) Officer Echols testified that, at that point, he needed to find a licensed driver in the vehicle so that they could drive off the property with the children who had just responded to the vehicle. (Tr. at 54) Officer Echols had the dispatcher run each individual's name in order to determine if there was a licensed driver for the vehicle. (Tr. at 55) The backseat passenger gave Officer Echols the name Jose Smith. (Tr. at 55) That name came back no record. (Tr. at 55) Officer Echols testified that when a name comes back as no record it means that the information provided is in no database, therefore, it cannot be confirmed that the person gave correct information. (Tr. at 55) Officer Echols then talked to the occupants of the vehicle to verify the backseat passenger's name and to see if the person would provide different information. (Tr. at 56) At some point, the backseat passenger said his name was actually Jesse Valdez. (Tr. at 56) Officer Echols determined that no one in the vehicle, including the woman with the children, was a licensed driver. (Tr. at 56)

10. Detective Pagel testified that he walked over to identify the individual in the front passenger's seat. (Tr. at 34) This was the individual wearing the dark blue shirt with the name Traviesos across the back and the number 13. (Tr. at 37) The individual (later identified as defendant Sanchez-Munoz) told Detective Pagel his name was Jonathan Chavez. (Tr. at 34, 36) Detective Pagel ran the name Jonathan Chavez through the computer system and it did not come back on file. (Tr. at 34) Detective Pagel testified that based on his training and experience, typically when someone does not come back on file and they are adult age, they are giving a fake name. (Tr. at 34-35) Detective Pagel testified that it takes some time to resolve the situation when a name given does not come back on file. (Tr. at 39) Typically, officers will investigate a bit further to make sure they know who they are dealing with. (Tr. at 39)

11. Detective Pagel testified that when he has someone that comes back not on file and the person has not provided him with any kind of a picture ID, he goes back and

5

asks them if they have anything with their name on it at all, any kind of formal identification. (Tr. at 35) Detective Pagel could not recall what defendant Sanchez-Munoz's exact response was to this question, but Detective Pagel then asked him if he would step out of the vehicle and let Pagel check his pockets for any kind of identification. (Tr. at 35) Detective Pagel testified that Sanchez-Munoz was cooperative, said sure, and stepped out of the car. (Tr. at 35) Before Detective Pagel could check his pockets, Sanchez-Munoz notified Pagel that he had a handgun in his pocket. (Tr. at 35) Detective Pagel testified that it is his standard practice to always handcuff an individual for safety before he removes a firearm from the individual's pocket or waistband. (Tr. at 35) After Detective Pagel handcuffed Sanchez-Munoz, he removed a handgun from his pocket. (Tr. at 35-36) Detective Pagel checked the serial number on the handgun through the computer system and it came back as a stolen handgun out of Shawnee, Kansas. (Tr. at 36-37) Defendant Sanchez-Munoz was arrested for possession of stolen property. (Tr. at 37)

12. Officer Echols transported defendant Sanchez-Munoz to the Independence Police Department substation. (Tr. at 37, 58) In a search incident to his arrest, the officers located identification in Sanchez-Munoz's wallet. (Tr. at 38, 58) The name on the identification did not match the name that Sanchez-Munoz had provided. (Tr. at 38) Sanchez-Munoz admitted that he was an illegal immigrant and a gang member and that the permanent resident card that the officers had in hand was a forged document. (Tr. at 16, 38) Sanchez-Munoz also admitted to his true identity. (Tr. at 58) Officer Echols testified that Sanchez-Munoz was not issued any citations, but was placed on a 24-hour hold for the gun violation. (Tr. at 58)

13. Officer Echols testified that no one was issued a citation for trespass that day, even though they could have been. (Tr. at 58-59) Officer Echols testified that the officers' goal was to make sure that the persons understood that they were to leave the property. (Tr. at 58) Once they understood that, it was then the officers' mission to make sure that they found a safe way to leave the property. (Tr. at 58-59) The officers allowed the persons stopped (other than defendant Sanchez-Munoz) to stay in their car until they found a licensed driver to drive them home. (Tr. at 59)

### III. DISCUSSION

Defendant Sanchez-Munoz seeks to suppress all evidence and testimony procured through a warrantless seizure and detention on March 4, 2017, in violation of defendant's Fourth Amendment rights. (Motion to Suppress Evidence (doc #29) at 1) Defendant argues that "[b]ecause the warrantless seizure of Mr. Sanchez-Munoz was not justified by any traffic

6

infraction or reasonable suspicion that he was involved in any type of criminal activity, all evidence and testimony obtained as a result of this violation should be suppressed pursuant to the exclusionary rule." (Id. at 2) Defendant further argues that "[e]ven assuming, *arguendo*, that the traffic stop for trespassing was permissible, Echols unlawfully prolonged the duration of the seizure in violation of the Fourth Amendment after learning that the vehicle was there to pick up women and children." (Id. at 5) Finally, defendant argues that "[b]ecause the evidence against Mr. Sanchez-Munoz was obtained as a direct result of an unreasonable stop and detention in violation of the Fourth Amendment, the court should suppress the evidence pursuant to the exclusionary rule." (Id. at 6)

Both investigative stops and arrests are seizures. However, an investigative stop need only be supported by a reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause. See Terry v. Ohio, 392 U.S. 1, 25-31 (1968). In determining whether an officer had reasonable suspicion to conduct an investigative stop, the court must look at the totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing. See United States v. Montgomery, 828 F.3d 741, 743-44 (8th Cir. 2016).

The record in this case establishes that Officer Echols responded to the area to ensure that the subjects who were requested to leave did, in fact, leave the property due to the fact that they were possible gang members. (Fact No. 6) Officer Echols activated the emergency lights on his patrol car and stopped the subject vehicle as it passed an exit to get out and started to circle around to the back side of the Sears store, clearly not leaving the property. (Id.) Officer Echols testified that he stopped the subject vehicle because "at that point I believed that they were trespassing, or they at least didn't understand that they were trespassing. And I decided to re-contact them."

(Id.)  In addition, based on the fact that they were potential gang members and because they had not left the property as directed, mall security had requested that Officer Echols put the three males on the barment list.  (Fact No. 8)  As Officer Echols was walking to the vehicle to contact the occupants and to ask them why then had not left the property, a woman with some children spoke to him and said that the vehicle was picking them up.  (Fact No. 7)  Officer Echols testified that he believes that someone can still be trespassing if they have been told to leave the mall and then do not leave, but come back to pick up family or friends.  (Id.)

The Court finds that Officer Echols had a particularized and objective basis for suspecting legal wrongdoing (that is trespassing) which provided a sufficient basis for stopping the vehicle containing the three persons he believed were trespassing.   After he stopped the vehicle, Officer Echols obtained additional information that the persons were picking up others from the mall.  The Court finds that Officer Echols was justified in contacting the persons in the vehicle to investigate whether they were in fact picking up others and then leaving the property as directed.  As set forth in United States v. Trogdon, 789 F.3d 907, 913 (8th Cir. 2015), "a reasonable belief, even if it is mistaken, [that persons are trespassing] can justify an investigative stop."  In addition, mall security had requested that Officer Echols identify the three males and place them on the barment list.  When Officer Echols attempted to identify the driver of the vehicle, he determined that he was not a licensed driver, thus extending the length of the stop until a licensed driver could be located to drive the vehicle (and persons) off the property.  (Fact No. 9)  As set forth in United States v. Cloud, 594 F.3d 1042, 1045 (8th Cir. 2010), "a lawful detention may be prolonged for a reasonable time without violating the Fourth Amendment if complications arise while checking identification—such as Cloud's alias being reported as 'not on file.'"  Officer Echols testified that his goal in making the stop was to make sure the persons understood that

8

Case 4:17-cr-00125-GAF   Document 44   Filed 03/06/18   Page 8 of 10

they were to leave the property.  (Fact No. 13)   Once they understood that, it was then his mission to make sure that they found a safe way to leave the property.  (Id.)   No constitutional violation took place with regard to the stop of the vehicle.

The Court further finds that Detective Pagel's action in asking for the front seat passenger's name (later identified as defendant Sanchez-Munoz) was reasonably necessary to determine that person's identity both for the barment list and because a request for identification was within the reasonable scope of the investigative stop for trespassing.  See United States v. Dawdy, 46 F.3d 1427, 1430 (8th Cir. 1995)(holding that request for identification of all vehicle occupants was within reasonable scope of investigative stop regarding a vehicle parked in the parking lot of a closed business).  Defendant Sanchez-Munoz initially gave a name that the computer system found as not on file.  (Fact No. 10)   Detective Pagel asked Sanchez-Munoz if he would step out of the vehicle and let Pagel check his pockets for any kind of identification. (Fact No. 11)   Sanchez-Munoz said sure and stepped out of the car.  (Id.)   Before Detective Pagel could check his pockets, Sanchez-Munoz notified Pagel that he had a handgun in his pocket.  (Id.)   The handgun was stolen.  (Id.)   Sanchez-Munoz was arrested for possession of stolen property.  (Id.)   No constitutional violation took place with regard to the seizure of defendant Sanchez-Munoz.

## IV.  CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant's Motion to Suppress Evidence (doc #29).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation.  A failure to file and serve objections by this date shall bar an attack on

appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

>*/s/ Sarah W. Hays*
> SARAH W. HAYS
> UNITED STATES MAGISTRATE JUDGE